## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **REGINALD HOLLIDAY and** | ) | |
| **FRED BIONDO, on behalf of themselves** | ) | |
| **and all other persons similarly situated,** | ) | |
| **known and unknown,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 4:12-cv-01732-ERW** |
| **v.** | ) | |
| | ) | |
| **J S EXPRESS INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO AUTHORIZE NOTICE TO SIMILARLY SITUATED PERSONS PURSUANT TO 29 U.S.C. § 216(b)

Defendant J S Express Incorporated ("JS Express" or the "Company") opposes Plaintiffs', Reginald Holliday ("Holliday") and Fred Biondo ("Biondo", or, collectively "Plaintiffs"), Motion to Authorize Notice to Similarly Situated Persons Pursuant to 29 U.S.C. § 216(b) (the "Motion") as follows:

## I.      INTRODUCTION

Plaintiffs seek conditional certification of over a thousand present and former independent contractors ("Contractors") they claim were misclassified and subsequently denied overtime and minimum wage compensation.  Plaintiffs' Motion must be denied as they fail to present **any** admissible evidence – not even a single declaration from a named plaintiff or putative class member – that they and the putative class members they seek to represent are "similarly situated."   While Plaintiffs attach a partial Department of Labor ("DOL") file, allegedly in support of their Motion, it is not relevant to Plaintiffs' Motion and is inadmissible under the Federal Rules of Evidence.

Plaintiffs failure to set forth any admissible evidence is hardly surprising.   The Contractors they seek to represent work out of over a dozen states, in different industries, for different JS Express clients with innumerable distinct demands, with countless different vehicles requiring endless differences in mileage rates, maintenance costs and hauling capabilities, with different compensation methods and pay rates that vary Contractor to Contractor, day to day, client by client and location by location.   Moreover, the named plaintiffs worked exclusively out of the Chicago area and exclusively for third-party U.S. AutoForce.   Less than 1% of the JS Express contractors worked on the unique contract that JS Express had with U.S. AutoForce. Quite simply, Plaintiffs have not – and cannot – meet their burden of making substantial allegations, supported by admissible evidence, that they are "similarly situated" to the purported class.

Even if they could meet this burden – and they cannot – Plaintiffs' Motion must be denied due to the individualized inquiry necessary to determine each potential class member's exempt status, liability and damages.   Should certification be granted, this Court could be forced to conduct over 1,000 minitrials regarding exempt status, another 1,000-plus minitrials regarding overtime liability, another 1,000-plus minitrials regarding minimum wage violations, and, finally, another 1,000-plus minitrials regarding damages.   Moreover, it will still have to resolve Plaintiffs' six individual claims, allegedly arising under Illinois law.

To the extent that a collective action is conditionally certified, Plaintiffs' proposed notice and consent forms do not adequately and fairly inform potential class members about the nature of this action and the effects of joining.   Additionally, Plaintiffs' request to send out a "reminder" notice is intrusive and unnecessary.   Finally, equitable tolling of the statute of limitations is not appropriate.

## II.     BACKGROUND

### A.     Plaintiffs' Claims

In their Third Amended Complaint, Plaintiffs assert collective claims for unpaid overtime under the FLSA (Count I) and failure to pay minimum wages under the FLSA (Count VII). Plaintiffs also assert six individual claims under Illinois wage and hour laws.

### B.     JS Express' Business

JS Express partners with its clients to provide delivery services.  *Certification of John N. Cochran, Jr.* ("*Cochran Cert.*") (attached hereto as Exhibit A), ¶ 3.  The Company commenced operations in St. Louis, Missouri on December 6, 1983 and subsequently opened branch locations in Kansas City, Memphis and Indianapolis.  *Id.* at ¶ 4.  JS Express closed its Memphis facility about five years ago.  *Id.*

JS Express' clients fall into three basic industries: financial/professional, trade/industrial and medical.  The financial/professional clients include banks, professional firms (e.g., legal, accounting), government agencies, insurance companies, travel agencies, mortgage/title companies, and payroll processing.  *Cochran Cert.*, ¶ 6.  The trade/industrial clients include wholesale distributors, auto parts and office supply stores, construction firms, publishing companies, and computer companies.  *Id.*  The medical clients include hospitals, laboratories, pharmacies, assisted living facilities, and blood collection centers.  *Id.*

Each industry's clients' needs are distinct.  *Cochran Cert.*, ¶ 7.  Further, as explained more fully below, clients' needs within each industry vary as well.  *Id.* at ¶ 8.

### C.     Contractors

Contractors contract with JS Express for the opportunity to perform transportation and delivery services needed by JS Express' clients.  *Cochran Cert.*, ¶ 14.  The services performed

by Contractors at JS Express' St. Louis, Indianapolis and Kansas City locations depend upon the Contractors' choice of route type (on-demand, routed or both), JS Express' client-specific needs and requirements, the industry for which deliveries are being made, opportunities available day to day and location by location, the Contractor's availability and desire for more or less work, and the Contractor's choice of vehicle. *Id.*, at ¶ 15; *See also Certifications of Kenneth Maurice Gray (Gray Cert.), Daniel E. Dieters (Dieters Cert.), Kevin McClain (McClain Cert.), Chris McKnight (McKnight Cert.), John Haukap (Haukap Cert.), Richard H. Bauer (Bauer Cert.), Lori B. Rinaberger (Rinaberger Cert.), Gene M. Reeder (Reeder Cert.), Craig S. Fleming (Fleming Cert.), Richard Frisch (Frisch Cert.), Marcel Reynolds (Reynolds Cert.), Jasper Simpson (Simpson Cert.), Toney Goucher (Goucher Cert.), and Harry Hicks (Hicks Cert.)* (attached hereto as Exhibit B, subparts 1 – 14).

**D.  Type of Routed Work**

Generally, Contractors can choose from two types of work, if available: routed work (which includes night distribution work) and on-demand work. *Cochran Cert*, ¶ 8-9. Contractors who perform work through JS Express exclusively for a third-party and not through one of the Company's central locations – such as Plaintiffs Holliday and Biondo – may have more or less options depending on the client's needs. *Id.* at ¶ 14.

**1.  Routed Work**

Routed work varies based on the client.  Some routed work is fixed in that clients do not give Contractors much flexibility on the times for delivery or the sequence of stops. *Fleming Cert.*, ¶ 1, 13; *Gray Cert.*, ¶ 1.  Examples of such fixed routes include some pharmaceutical drug deliveries (because of nurse shift changes and patient waking up needing medication), and some bank deliveries (due to banks' practices involving items processing). *Cochran Cert.*, ¶ 15;

*Fleming Cert.*, ¶ 1; *Reeder Cert.*, ¶ 1; *Haukap Cert.*, ¶ 3.   Some routed work, however, is not fixed in that the Contractor is free to determine starting times and the sequence of stops and need only make pick-ups and deliveries within certain broad time frames.  *Haukap Cert.*, ¶ 3; *Goucher Cert.*, ¶ 14; *Simpson Cert.*, ¶ 11.  Payroll deliveries are an example of such non-fixed routed work in which the Contractor may deliver the payrolls in any sequence of stops, but must complete all deliveries by a set time, noon for some clients.  *Cochran Cert.*, ¶15; *Fleming Cert.*, ¶ 1.

Contractors choose the type of routed work they want, based on availability.  *Cochran Cert.*, ¶ 17; *Simpson Cert.*, ¶ 4; *Fleming Cert.*, ¶ 1-4; *Bauer Cert.*, ¶ 10; *Rinaberger Cert.*, ¶ 9; *Gray Cert.*, ¶ 13.  Opportunities for routed work in St. Louis, for instance, are posted at the JS Express St. Louis facility on a daily basis.  *Cochran Cert.*, ¶ 16; *Gray Cert.*, ¶ 13.  Contractors can place bids on the routes they want.  *Id.*  Frequently, the routes posted are one- or two-stop routes.  *Cochran Cert.*, ¶ 16.  Approximately 25% of the Contractors at the St. Louis location create their day's work through the posted route work.  *Id.* at ¶ 17.   At the branch locations, there is less posting of routed work because the client opportunities are not as prevalent.  *Id.* Whether Contractors such as Plaintiffs Holliday and Biondo were able to choose their routes was entirely dependent on the needs of the client they exclusively provided services to.  *Id.*  In addition to posted routes, Contractors obtain routes through communications with other Contractors and JS Express and by accepting routes available when the Contractor signs his or her contract with JS Express.  *Id.*

Contractors will often choose one type of routed work in the morning and another in the afternoon.  *Cochran Cert.*, ¶ 17; *Fleming Cert.*, ¶ 1; *Gray Cert.*, ¶ 1.  For example, a Contractor may deliver a payroll route in the morning and then bank runs in the afternoon.  *Id.*  Another

example of mixing routes involves the night distribution routes.  There are some clients whose products must be distributed at night.  *Cochran Cert.*, ¶ 17.  The needs of these customers vary daily so the Contractors create their own order of deliveries depending on the client needs, and then deliver based on the fixed or non-fixed client drop times, commingling those deliveries as applicable.  *Id.*  The method of compensation for routed work has varied over time and at different locations.  For example, some routed work is paid by the stop, while other routed work is paid by the route on a fixed basis.  *Id.*, ¶ 18.

### 2.     On-Demand Work

On-demand work also varies based on the client.  *Cochran Cert.*, ¶ 19.  There are Contractors who primarily or only do on-demand work.  *Id.*;  *Bauer Cert.*, ¶ 1; *Reeder Cert.*, ¶ 1. There are Contractors who provide on-demand services for only one client, such as Plaintiffs Holliday and Biondo.  *Id.*  An on-demand Contractor does not have any scheduled availability. *Id.*  Rather, the Contractor chooses when he or she wants to be available to make deliveries.  *Id.* To make it known to JS Express that the Contractor is available to make deliveries, the Contractor typically logs in using an android device.  *Id.*  At that point, JS Express informs the Contractor of on-demand deliveries that are available.  *Id.*  When the Contractor decides to no longer be available for on-demand deliveries for the day, the Contractor simply logs out of the system.  *Id.*  During the day, Contractors and JS Express communicate to determine what other on-demand pick-ups and deliveries are available.  Contractors doing routed work will often seek on-demand work to make extra money.  *Id.*  The opportunities for on-demand work vary among the JS Express locations, with the branch locations having fewer opportunities and Contractors such as Holliday and Biondo having fewer or no opportunities because the client needs differ. *Id.*  On-demand work is typically paid on a percentage basis. *Id.*

E.      **The Client's Requirements**

JS Express' clients also have varying requirements regarding their transportation and delivery service needs.  *Cochran Cert.*, ¶ 12.  Some clients, such as banks, require a specific order for the stops on a particular route.  *Id.*  Other clients, such as payroll companies, allow the Contractor to decide the order of stops.  *Id.*  Some clients want to communicate directly with the Contractor regarding deliveries, others do not.  *Id.*  Some clients require updates regarding the status of pick-ups and deliveries (with varying requirements regarding the services being provided by the Contractor).  *Id.*  Clients also have different requirements regarding the particulars as to the pickup and delivery of their packages, with some clients having requirements as to the location for entering and leaving the client location.  *Id.*

Some clients do not have needs on a regular basis, but do have pick-up and delivery needs at infrequent or immediate times.  Such clients may have daily needs but only require that pick-up and delivery occur sometime that day.  Or, they may only have needs at infrequent or random times.  They may have immediate needs or needs for unscheduled pick-ups.  *Id.* at ¶ 9.

The branch locations and client contracts have been opened and entered to accommodate one or more client's needs.  *Cochran Cert.*, ¶ 8-9.  Typically, over time, the branch locations have increased the number of clients they serve, which necessarily increases the amount and type of client work available for Contractors.  *Id.*  The same is not necessarily true for Contractors operating out of a location with no JS Express facility, such as Plaintiffs Holliday and Biondo.  *Id.* at 10-13.

In descending order, currently the largest JS Express locations with the most clients and the most varied client work available for JS Express' Contractors are as follows: St. Louis, Indianapolis, Kansas City.  *Cochran Cert.*, ¶ 5.

F.     **Plaintiffs Holliday and Biondo and Purported Class Members**

JS Express   has no offices in Chicago or Illinois.  *Cochran Cert.*, ¶ 4, 10.   From September 1, 2007 to December 31, 2012, it contracted with U.S. AutoForce's three separately managed locations in Alsip, Glendale Heights and Niles, Illinois – all centered around Chicago. *Cochran Cert.*, ¶ 4.   Named Plaintiffs and other Contractors delivered exclusively for U.S. AutoForce in Chicago and constituted less than 1% of the total Contractors.  *Cochran Cert.*, ¶ 14.  Initially, under JS Express' contract with U.S. AutoForce in Chicago, payment was made by the hour, which JS Express has never done on any other contracts.  *Cochran Cert.,* ¶ 41.

Plaintiffs claim they do not have the opportunity to exercise business skills and initiative, maintain separate business structures or subcontract their work.  *See Plaintiffs' Third Amended Complaint* (Third. Am. Compl.), Dkt. 55, ¶ 28-29, 31.  However, Contractors Marcel Reynolds, Dan Dieters and Kevin McClain all perform services for JS Express under their own business entities.  *Reynolds Cert.*, ¶ 6, *Dieters Cert.*, ¶ 7, *McClain Cert.*, ¶ 7.  Further, Marcel Reynolds and Chris McKnight have hired subcontractors in the past.  *Reynolds Cert.*, ¶ 5, 11; *McKnight Cert.*, ¶ 14.  Other Contractors recognize they can subcontract and know other Contractors who have.  *Hicks Cert.*, ¶ 11, *Haukap Cert.*, ¶ 6, *Reeder Cert.*, ¶ 17.

Plaintiffs also claim they and those similarly situated are precluded from working for others.  Dkt. 55, ¶ 38.  However, Contractor Harry Hicks owns and operates a promotional business called Show-Me Promotions, which he has been running for more than five years. *Hicks Cert.*, ¶ 16.  Contractor Daniel Dieters owns and operates DEI Home Inspections, LLC. *Dieters Cert.*, ¶ 7.  Contractor Chris McKnight currently works in a restaurant in addition to performing services for JS Express and formerly contracted with both JS Express and Access Courier, a JS Express competitor.  *McKnight Cert.*, ¶, 15.  Contractor Richard Frisch previously

managed a Steak N' Shake Restaurant while contracting for JS Express.  *Frisch Cert.*, ¶ 8.  He recently began contracting full-time because he makes more money.  *Id.*  Contractors who do not hold other jobs recognize that they can.  *Bauer Cert.*, ¶ 8 ("I understand I could go out and do work for another company at any time.  But I am happy with the routes I have available here.").

Plaintiffs allege Contractors had no control over the key determinants of profit and loss. Dkt. 55, ¶ 37.  However, Contractors in St. Louis and Kansas City can negotiate rates for services with JS Express, pick and choose routes based on profitability and time commitment, and are free to accept or reject work at will, with no advance warning, for any reason or no reason at all and without repercussion.  *Haukap Cert.*, ¶ 7 (negotiated rates a number of times, for instance: negotiated a rate of 65% instead of 62% for on-demand, local routes and negotiated for a higher rate on deliveries to Bloomington, Illinois); *Reeder Cert.*, ¶ 7, *Reynolds Cert.*, ¶ 3 (negotiated rate with JS Express when entered independent contractor agreement); *Gray Cert.*, ¶ 10, 13 (stating that there is a bid board in the St. Louis office were available routes are posted). Also, some Contractors, like Kevin McClain, advertise their own courier and delivery service with "anyone who will listen."  *McClain Cert.*, ¶22.

Similarly, Jasper Simpson and others turn down work where long drives make fuel costs uneconomical.  *Simpson Cert.*, ¶ 3; *Gray Cert.*, ¶ 8.  Others turn down work where – in their estimation – the route simply does not pay enough.  *McKnight Cert.*, ¶ 10 ("I usually don't take Scnucks runs because it's not enough money for me . . ."); *Fleming Cert.*, ¶ 7.  Still others optimize their profits by selecting a particular type of vehicle.  For instance, Kenneth Maurice Gray replaced his car with a van because he can carry more and earns higher rates per delivery for the larger items he carries. *Gray Cert.*, ¶ 5.  Contractor Richard Bauer "switched from a car to a truck over the past year because of fuel savings."  *Bauer Cert.*, ¶ 9.  Similarly, some

Contractors operate multiple vehicles so they can maximize profits, delivering payroll one day and large equipment the next. *Reynolds Cert.*, ¶ 7. Contractors also testify that they chose their vehicle because of the types of deliveries it permits them to make. *Fleming Cert.*, ¶ 6 (drives a minivan because "I can make more money delivering with a van.")

Plaintiffs also claim JS Express manages all aspects of deliveries, dictating when, where and how they are made. Dkt. 55, ¶ 36. However, U.S. AutoForce, not JS Express was responsible for overseeing all deliveries by Plaintiffs through their separate management. *Cochran Cert.*, ¶ 4, 18. Contractors at other JS Express locations did not share this experience. *Hicks Cert.*, ¶ 9, *Rinaberger Cert.*, ¶ 16, *Simpson Cert.*, ¶ 10, *Goucher Cert.*, ¶ 13; *Bauer Cert.* ¶ 10; *Haukup Cert.*, ¶ 13, *Gray Cert.*, ¶ 9; *Flemings Cert.*, ¶ 13, 23. Plaintiffs also allege that they are required to wear a JS Express uniform and purchase a cellular telephone. Dkt. 55, ¶ 34. Again, other Contractors disagree. *Gray Cert.*, ¶ 12; *Dieters Cert.*, ¶ 14; *Rinaberger Cert.*, ¶ 20; *Goucher Cert.*, ¶ 18; *Hicks Cert.*, ¶ 12; *Simpson Cert.*, ¶ 14.

In fact, other Contractors for JS Express report that they understand they are independent contractors. *Gray Cert.*, ¶ 11; *Dieters Cert.*, ¶ 18; *McClain Cert.*, ¶ 15; *McKnight Cert.*, ¶18; *Bauer Cert.*, ¶13; *Rinaberger Cert.*, ¶ 24; *Reeder Cert.*, ¶ 20; *Fleming Cert.*, ¶15; *Frisch Cert.*, ¶14 ("I know I am an independent contractor. I've been self-employed for 20 years in various capacities, so I'm very familiar with how this works."); *Hicks Cert.*, ¶ 6; *Simpson*, ¶ 8; *Reynolds Cert.*, ¶ 14; *Goucher Cert.*, ¶ 7. They do not consider themselves "permanent employees." *Dieters Cert.*, ¶ 21; *McClain Cert.*, ¶ 19; *Frisch Cert.*, ¶ 15; *Hicks Cert.*, ¶ 6. They deny that they are under a windows of hours in which they must "report" for work. *Gray Cert.*, ¶ 14; *McKnight Cert.*, ¶ 24; *Bauer Cert.*, ¶ 13. They deny that they have to report their daily availability to JS Express. *Gray Cert.*, ¶ 15; *Dieters Cert.*, ¶ 22; *McClain Cert.*, ¶ 20; *McKnight*

*Cert.*, ¶ 23.   They deny that they have ever been paid on an hourly basis.  *Gray Cert.*, ¶ 13; *McClain Cert.*, ¶ 5; *Fleming Cert.*, ¶ 9; *Simpson Cert.*, ¶ 9   They testify that they receive different rates for different routes.  *Gray Cert.*, ¶ 5; *Rinaberger Cert.*, ¶ 9; *Goucher Cert.*, ¶ 11; *Hicks Cert.*, ¶ 8; *Simpson Cert.*, ¶ 11   They proclaim that contracting with JS Express is a "win win" situation for them.  *McKnight Cert.*, ¶ 9; *Rinaberger Cert.*, ¶ 12.  They state that they are the boss of their own job and that they compete for work.  *Gray Cert.*, ¶ 18; *Haukap Cert.*, ¶ 13; *Reeder Cert.*, ¶ 10; *Reynolds Cert.*, ¶ 8.  They deny that they are or have ever been referred to by JS Express as "Fleet Drivers."  *McClain Cert.*, ¶ 17; *Dieters Cert.*, ¶ 18; *McKnight Cert.*, ¶ 20; *Haukap Cert.*, ¶ 21; *Bauer Cert.*, ¶ 16; *Reeder Cert.*, ¶ 23; *Reynolds Cert.*, ¶ 16.  They recognize that if they make a mistake, it is on them, and they are responsible for making it right.  *McClain Cert.*, ¶ 18; *McKnight Cert.*, ¶ 21; *Bauer Cert.*, ¶ 17 ("I know my settlement can be reduced if I make a mistake and a customer needs to be refunded"); *Fleming Cert.*, ¶ 19; *Goucher Cert.*, ¶ 15.

## III.   ARGUMENT

Plaintiffs' motion to certify a collective action under 29 U.S.C. § 216(b) must be denied.

### A.   Plaintiffs' Motion Must Be Denied As They Fail To Submit A Single Declaration, Or Any Other Admissible Evidence, Supporting Their Claim That Putative Class Members Are "Similarly Situated"

Under 29 U.S.C. § 216(b), an employee may bring an action under the FLSA on his own behalf as well as for those "similarly situated."  The FLSA does not define "similarly situated" and the Eighth Circuit has not defined the standards for determining whether potential putative plaintiffs are "similarly situated."  *Huang v. Gateway Hotel* Holdings, 248 F.R.D. 225, 227 (E.D.Mo. 2008).  However, courts in the Eighth Circuit, including this Court, have conducted a two-step analysis to determine whether individuals are "similarly situated."  *Littlefield v. Dealer Warranty Services, LLC*, 679 F. Supp.2d 1014 (E.D.Mo. 2010).

In the first step, the notice stage, the Court determines whether notice of the action should be given to potential class members. *Littlefield*, 679 F.Supp.2d at 1016. Conditional certification at the notice stage requires substantial allegations that the putative class members were together the victims of a single decision, policy or plan. *Id.* at 1017; *Pennington* at *1. Plaintiffs may satisfy their burden through the use of affidavits, supported by admissible evidence. *Id.*; *See also Denney v. Lester's LLC*, No. 4:12CV377 JCH (E.D.Mo. 2012). "[They] may not meet this burden through unsupported assertions of additional plaintiffs and widespread FLSA violations," or with nothing more than mere averments in their Complaint. *Id.*; *Wacker v. Pers. Touch Care, Inc.*, 2008 WL 4838146, *1 (E.D.Mo. Nov. 6, 2008) (Court denied class certification where plaintiff failed to testify that he was denied overtime compensation); Similarly, plaintiffs must do more than make statements based on "information and belief" or "speculat[ion] about what [they] think[] happened." *Tab Evans v. Contract Callers, Inc.*, 2012 WL 234653 (E.D. Mo. Jan. 25, 2012) (emphasis added).

Contrary to Plaintiffs contention, JS Express' classification of individuals who perform courier services as independent contractors does not constitute a single policy, decision or plan. As such, Plaintiffs' threadbare allegation that they are "similarly situated" to all other Contractors based on their classification status is not sufficient for the purposes of an FLSA collective action.

i.     *Plaintiffs Fail to Put Forth any Declarations in Support of Their Claims*

Neither the named plaintiffs nor any putative plaintiffs submitted declarations to support their claims. In *Pennington v. Integrity Communications*, 2013 WL 357516, *1-2 (E.D.Mo. January 29, 2013), this Court denied plaintiffs' first and second motions to conditionally certify a class of allegedly misclassified cable installers who claimed "defendants had a corporate-wide

common policy or plan where they misclassified cable installers as 'independent contractors' instead of employees and required them to work more than 40 hours per week without overtime pay." Though plaintiffs alleged defendant had a company-wide policy of misclassification and supported their original motion with three declarations from the named plaintiffs regarding their individual relationships with the defendant, they made no claims regarding the relationship between the defendant and the putative class members. *Id.* Accordingly, this Court found they failed to make "substantial allegations that the putative class members were together the victims of a single decision, policy or plan." *Id.* Further, though Plaintiffs submitted four declarations in connection with their renewed motion, which claimed they "witnessed and were aware of other cable installers being compensated inappropriately," and stated they overheard conversations by installers regarding their unfair compensation, this Court again denied their motion. *Id.* The Court found that the statements in Plaintiffs' declarations regarding the putative class members constituted nothing more than inadmissible hearsay, and were insufficient to meet plaintiffs' burden at the notice stage. *Id.*

Similarly, in *Tab Evans v. Contract Callers, Inc.*, this Court denied conditional certification where plaintiff alleged his former employer violated the FLSA by failing to pay overtime and minimum wage, but presented only his own affidavit and that of one other employee. 2012 WL 234653, at *1. The Court found plaintiff's repeated declaration that "upon his best information and belief" other employees that worked at the same office and location as he did experienced the same or similar FLSA violations due to the employer's policy were insufficient. *Id.*

Likewise, in *Wacker v. Pers. Touch Care, Inc.*, this Court denied conditional certification where the plaintiff himself failed to testify that he was denied benefits under the FLSA and

where the only admissible evidence was a single declaration based on speculation and belief. 2008 WL 4838146 at *1.   The single employee affidavit plaintiff produced stated that the employee was "'very familiar with' and [had] 'direct knowledge of' the national and local operations and policies of [defendant.]   [However,] the affidavit provide[d] nothing specific to explain how, from [the affiant's] office in Missouri, she learned the facts she purport[ed] to know about the operations of the other affiliates." *Id.* at *2.

Courts nationwide have applied similar reasoning in denying conditional class certification. *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 288 (S.D. Tex. 2012) (Court denied conditional certification for welders who alleged they were misclassified as independent contractors and claimed defendant's "common decision, policy or plan was [its] uniform classification of the [p]laintiffs and putative plaintiffs as independent contractors" on basis that classification is not dispositive for conditional certification.); *Harriel v. Wal-Mart Stores, Inc.*, WL 2878078 (D.N.J. July 13, 2012) (conditional class certification denied where plaintiff claimed he was similarly situated to employees with similar job titles and duties, but failed to provide the existence of even one other person who would chose to opt in to the putative class and establishing an FLSA violation would require an examination of each employee's individual work experiences); *Hall v. Guardsmark, LLC*, 2012 WL 3580086 (W.D. Pa. Aug. 17, 2012) (conditional certification of nationwide class of security guards denied where only declarations submitted were plaintiffs' own and no proof of potential class members with intent to join).

Here, Plaintiffs did not submit their own declarations; Plaintiffs did not submit declarations from any other Contractors working in Chicago; Plaintiffs did not submit declarations from any Contractors working for U.S. AutoForce, which amounted to less than 1%

of JS Express' Contractors; and Plaintiffs did not submit any declarations from any Contractors working outside of Chicago or working for a different client.   Instead, they seek to rely on "catch-all" allegations that JS Express "employs other [Contractors], like Plaintiffs . . .," without naming a single "similarly situated" individual or listing when, where or how Plaintiffs observed that they are "similarly situated."   In short, Plaintiffs put forth even less proof than the unsuccessful plaintiffs in *Pennington, Tab* and *Wacker*, and their Motion must be denied.

ii.    *Plaintiffs Cannot Use the Department of Labor's Documents To Meet Their Evidentiary Burden*

In addition to the foregoing, Plaintiffs cannot rely on the Department of Labor's investigation regarding JS Express to meet their obligation to come forward with "admissible evidence" supporting their motion for nationwide collective treatment.   *Jost v. Commonwealth Land Title Ins.*, No. 4:08-cv-734, 2009 WL 211943, *3 (E.D. Mo. Jan. 27, 2009).

First, the documents are not relevant to the issue currently before the Court – whether the putative class members are "similarly situated."  29 U.S.C. § 216(b).  The documents describe, at best, an incomplete investigation into a single complaint, arising from a single location, regarding one employee's status.   (*See, e.g.,* Dkt. 53-2 at pages 10, 16 of 42).  The investigator does not appear to have considered whether different Contractors, particularly those in different states, were differently situated than the complainant.   Instead, the investigator focused her attention on the merits of the single complainant's claim under the FLSA.  (Dkt. 53-2 at 15-25 of 42).  As the Court is aware, however, "the merits of plaintiff's claims are not considered" at the conditional class certification stage.  *Huang*, 248 F.R.D. 225, 227 (E.D. Mo. 2008).  at 227.  So, the Department's records are not relevant to and do not support Plaintiffs' motion for conditional class certification.

Second, even if the documents were relevant to the current motion, they are not the type of documents that should be admitted to evidence under Fed. R. Evid. 803(8).   Although Rule 803(8) creates an avenue for the admission of certain public records, the text of the rule and courts at all levels caution trial courts about admitting reports where there may be a "lack of trustworthiness."  Fed. R. Evid. 803(8)(B); *Palmer v. Hoffman*, 318 U.S. 109, 113-114 (1943); *Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1309-10 (8th Cir. 1984).  "Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof...that []he determines to be untrustworthy."  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988).

Here, the documents are untrustworthy for a number of reasons.  As an initial matter, the documents make clear that the Department was aware that its investigation was "limited."  (Dkt. 53-2 at page 10-11 of 42).  There is also no indication that the investigation was ever completed. To the contrary, the Department "decided not to expend any further resources toward the litigation as a result of pending private litigation" (Dkt. 53-2 at pages 12 of 42), correctly leaving the finding of fact and conclusions of law to this Court.  To that end, the documents relied upon by Plaintiffs are no more than the investigator's report to her superior.  No hearing was held. *Beech Aircraft Corp.*, 488 U.S. at 167 n. 11 (noting that the rules Advisory Committee's proposed test for trustworthiness included "whether a hearing was held").  There is nothing in the documents or Plaintiffs' counsel's affidavit indicating that the documents represent a final finding or opinion of the Department or the Secretary.  *See, e.g., Junk v. Terminex Int'l Co.*, 628 F.3d 439, 449 (8th Cir. 2010) (properly excluding report that was not the official opinion of the EPA and bore a prominent disclaimer reducing its trustworthiness).  Moreover, among other inconsistencies and oversights, the documents i) inaccurately state the nature of JS Express'

business as "Pharmaceutical Sales/Carrier," ii) include a statement from Plaintiff Holliday that is unsigned, does not give details of daily duties or tasks, does not reference duties of other JS Express Contractors or even attempt to make comparisons; iii) do not include a statement from or notes regarding Plaintiff Biondo or any other Contractor, and iv) make no mention of the Chicago Contractors, named Plaintiffs or U.S. AutoForce. (Dkt. 53-2-5)

Perhaps most troubling is that the investigation and resulting documents were clearly created with a view towards litigation. (Dkt. 53-2 at pages 12, 28 – 42) (noting that the investigation was "especially…likely to be referred to the RSOL for litigation."). In that context, Plaintiffs cannot credibly present the investigation reports as the opinion of a neutral fact-finder. The Department was preparing its case as a litigant before the court. The Supreme Court has long held that when a document's "primary utility is in litigating" it cannot be admitted under a hearsay exception intended for records of a business or agency's normal operations. *Palmer v. Hoffman*, 318 U.S. 109, 113-114 (1943); *see also Beech Aircraft Corp.*, 488 U.S. at 167 n. 11 (Advisory Committee's proposed test for trustworthiness included whether the agency had a "possible bias when reports are prepared with a view to possible litigation").

The Department of Labor documents also lack trustworthiness, and should not be admitted under Rule 803(8)(B), because they are unauthenticated and heavily redacted. Just like the Department of Labor report excluded in *Rodriguez v. Smithfield Packing Co., Inc.*, 545 F.Supp.2d 508, 513-14 (D. Md. 2008), the documents have not been authenticated under oath by any Department official. Many of the pages are merely "typewritten pages containing no indication of [their] source…or even an indication that [they] were issued by the Department of Labor." *Id.*; (*see* Dkt. 53-2 at pages 12-29 of 42). The names of the complainant, the investigator, and other significant details in the reports and exhibits have all been redacted. *See*

*Rodriguez*, 545 F.Supp. 2d at 514.  A document with these characteristics lacks trustworthiness and should not be admitted under Rule 803(8)(B).  *Id.*

Finally, the documents are not admissible because they contain hearsay from unidentified witnesses.  The documents contain substantial information that could only have come from the complainant and/or other Contractors.  These statements constitute hearsay.  Fed. R. Evid. 801(c).  The documents that restate those hearsay statements present "an instance of double hearsay."  *U.S. v. Ortiz*, 125 F.3d 630, 632 (8th Cir. 1997).  The Department's documents, therefore, are "inadmissible unless each level of hearsay falls within an exception to the hearsay rule."  *Id.*; *see also Hamilton v. Missouri Dep't of Corr.,* No. 08-3277-cv, 2011 WL 1309464, *2-3 (W.D. Mo. April 4, 2011).  Accordingly, even if Rule 803(B) would allow admission of the documents as a public record, the documents are not admissible because they contain a second layer of hearsay.

JS Express, moreover, cannot adequately conduct a cross-examination regarding the statements and conclusions set forth in the documents.  Courts should be wary of relying on investigative reports to find facts because of the "inability of the defendant to cross-examine the report in the same way that a party can cross-examine an adverse witness."  *Johnson*, 734 F.2d at 1309.  JS Express would be further disadvantaged here because it cannot cross-examine either the complainant or the Department's investigator.  Their names have been redacted.  (*See, e.g.,* Dkt. 53-2 at pages 16, 29-31 of 42).  JS Express simply has no way to verify or challenge the facts, opinions and conclusions stated in the documents.

For all of these reasons, the Plaintiffs cannot rely on the Department of Labor's investigative report and related documents to meet their burden to provide some admissible evidence in support of their motion for conditional class certification.

**B.**   **Putative Plaintiffs Are Also Not Similarly Situated For The Separate And Independent Reason That Determining Their Status Under the FLSA Requires A Fact-Intensive Individual Analysis**

Plaintiffs' Motion must fail for the separate and independent reason that collective treatment is not appropriate or feasible in this case due to the individualized inquiry necessary to determine exempt status for each proposed class member, liability and damages.  Whether a worker is an employee or an independent contractor is a mixed legal and factual question that heavily depends on the facts relating to each individual, and which is a relevant determination when considering whether workers are "similarly situated." *Young v. Cerner Corp.*, 503 F. Supp. 2d 1226 (W.D. Mo. 2007) (finding job duties relevant where salaried employees brought suit to recover overtime pay under the FLSA); *Watson v. Surf-Frac Wellhead Equip. Co., Inc.*, 4:11-CV-843 KGB, 2012 WL 5185869 (E.D. Ark. Oct. 18, 2012) ("job duties ... will often be relevant to whether the employees are similarly situated ... insofar as their job duties relate to whether they were correctly classified as exempt from the FLSA's overtime requirements.") (internal citations omitted).

To determine whether an individual is an employee or an independent contractor under the FLSA, courts within the Eighth Circuit apply a six-factor "economic realities test" based on the totality of the circumstances. *Dole v. Amerilink Corp.*, 729 F.Supp. 73, 75-76 (E.D.Mo. 1990).  Due the highly individualized nature of this inquiry, Courts in both this Circuit and nationwide have denied conditional certification in cases such as this where there are material differences in the duties and responsibilities of allegedly misclassified workers. *See, e.g., Young v. Cerner Corp.*, 503 F. Supp. 2d 1226 (W.D. Mo. 2007) (denying conditional certification where allegedly misclassified workers' "job responsibilities were so varied that court would have to entertain myriad individualized analyses of whether employees in particular jobs were properly

exempt by employer."); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003) (denying conditional certification for allegedly misclassified, salaried employees as not similarly situated, and collective action not appropriate where proposed class included several thousand current and former employees and there were material differences in duties and responsibilities of those employees.); *Andel*, 280 F.R.D. at 288 (Court denied conditional certification for welders who alleged they were misclassified as independent contractors as "it must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole. . . [and] [a]n inquiry into the employee's specific job duties . . . is not appropriate in a class lawsuit under Section 216(b)."); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265 (M.D. Ala. 2004) (denying conditional class certification for allegedly misclassified store managers or assistant store managers nationwide where variations in evidence concerning amount of time spent running a cash register, stocking shelves, making signs, etc. versus managing the retail store); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 506 (M.D. La. 2005) (denying conditional certification of allegedly misclassified workers were case involved multiple geographical locations across the country and individual issues would predominate due to variances between locations, supervisors and factual situations and because damages would need to be calculated on a case-by-case basis.); *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, *8 (E.D.La. July 2, 2004) (a case to recover unpaid overtime should not be even conditionally certified where the potential opt-in plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis"); *Clausman v. Nortel Networks, Inc.*, 2003 WL 21314065, *5 (S.D.Ind.2003) (where members of defendant's

sale staff performed their duties in a variety of ways with respect to customer contact and time spent away from the office depending on the sales group to which they were assigned, individual inquiry was necessary to determine whether each was properly classified under the FLSA).

If this Court certifies this class, it would have to conduct a fact intensive and individualized analysis for each and every one of the 1000-plus potential plaintiffs that opt in to determine if each plaintiff was improperly classified as an independent contractor.

Further, even assuming this Court finds that Plaintiffs and other purported class members were misclassified, the Court would then have to examine the time recording practices of each and every class member to determine if there were any overtime violations.  This would require the Court to make detailed factual findings regarding, *inter alia*, 1) whether each Contractor worked during all of the time they claim to have worked, 2) whether each Contractor recorded all of their time, 3) how much time each Contractor worked in a given week, and 4) how much each Contractor received for their services.  Each of these factors, varies job by job, location by location, client by client and Contractor by Contractor, with Contractors often receiving varying rates for work performed each day.

Similarly, regarding a determination of minimum wage violations, pursuant to Plaintiffs' own motion, this Court will be forced to evaluate, for each opt-in plaintiff, 1) the highly-individualized costs incurred by each Contractor in paying for fuel and vehicle maintenance - which varies drastically from vehicle to vehicle, location to location, route to route and day to day, 2) the weekly miles driven by each Contractor, which can vary by hundreds of miles, and 3) individualized mileage reimbursement JS Express paid to each Contractor under certain circumstances.

Likewise, after conducting potentially 1,000-plus minitrials concerning exempt status and then another potential 1,000-plus minitrials regarding liability, this Court will still need to conduct another potential 1,000-plus minitrials to determine damages.

There is simply no way for Plaintiffs to prove, and no feasible way for this Court to adjudicate, this issue on a class-wide basis.  Courts within this Circuit and across the country have refused to treat this kind of case as a collective action when, in reality, it would be more like hundreds of individual claims brought by plaintiffs who are not similarly situated in material respects.  This Court should do the same and Plaintiffs' Motion should be denied.

**C.      The Named Plaintiffs Occupied Unique Positions And Are Not Similarly-Situated With Contractors Who Did Not Work On The U.S. AutoForce Contract In Chicago.**

The named Plaintiffs occupied a unique position within JS Express, which was short-lived and no longer exists.  They delivered solely for U.S. AutoForce in Chicago, Illinois. *Cochran Cert.*, ¶ 4, 10.  Those Contractor relationships existed only to serve U.S. AutoForce.  JS Express  has no offices in Chicago or in Illinois and no other contracts in Illinois.  *Cochran Cert.,* ¶ 4.  While JS Express also had Contractors in St. Louis who delivered for U.S. AutoForce, the total amount of Contractors who delivered for U.S. AutoForce constituted less than 1% of all Contractors.  *Cochran Cert.*, ¶ 14.  These unique roles no longer exist as JS Express no longer has its contract with U.S. AutoForce. *Cochran Cert.*, ¶ 4.

Plaintiffs have no independent knowledge of the operations of the other Contractors, and plaintiffs have offered no evidence from any other Contractors.  Again, plaintiffs have submitted no evidence in support of their Motion, but, even if they had, there is no basis to believe that the Chicago-based Contractors would have any knowledge (let alone admissible evidence) regarding how JS Express's main locations function and how other Contractors run their businesses.

Nonetheless, Plaintiffs make threadbare allegations that JS Express treated all of its drivers the same. **There is simply no foundation for this argument**. Indeed, plaintiffs' argument is undercut by the 14 attached Contractor Certifications, including the Certification of Marcel Reynolds, another Contractor who worked out of the Chicago area for third-party U.S. AutoForce. *See Reynolds Cert.*

The "duties" of Contractors at JS Express' main locations in St. Louis, Indianapolis and Kansas City vary significantly from the "duties" of Contractors (such as plaintiffs) who performed work for a third-party in Chicago. These differences are evidenced in, among other things: Contractors' choice of route type (on-demand, routed or both), JS Express' client-specific needs and requirements, the industry for which deliveries are being made, the type and number of opportunities available day to day and location by location, the Contractor's availability and desire for more or less work, and the Contractor's choice of vehicle. *Supra*, § I. For example, Plaintiffs were – unlike all other Contractors – told by independent management for U.S. AutoForce what they were to do in any given day. *Cochran Cert.*, ¶ 10, *Reynolds Cert.*, ¶ 8. Additionally, the duties and circumstances of a Contractor providing on-demand services, such as named Plaintiffs, differ significantly from those providing other services as more fully set forth in JS Express' Statement of Facts in support of its Opposition. *Supra*, § II. Further, the different Contractor services provided and the needs of JS Express' clients at the various locations impact the method by which services are performed. *Supra*, § II.

Plaintiffs claim that Contractors must perform a route in the exact order and manner specified by the company. Dkt. 55, ¶ 36. Contractors in other locations did not share this experience and can control such things as the order of deliver, the pick-up time, and the delivery

time.  *Hicks Cert.*, ¶ 9, *Rinaberger Cert.*, ¶ 16, *Simpson Cert.*, ¶ 10, *Goucher Cert.*, ¶ 13; *Bauer Cert.* ¶ 10; *Haukup Cert.*, ¶ 13, *Gray Cert.*, ¶ 9; *Flemings Cert.*, ¶ 13, 23.

Plaintiffs claim they do not have the opportunity to exercise business skills and initiative or maintain separate business structures. Dkt. 55, ¶ 28-29.  Contractors outside of Chicago were treated differently.   *Supra*, § II.  For instance, Marcel Reynolds (Chicago), Dan Dieters (St. Louis) and Kevin McClain (St. Louis) all perform services for JS Express under their own business entities.  *Reynolds Cert.*, ¶ 6, *Dieters Cert.*, ¶ 7, *McClain Cert.*, ¶ 7.

Plaintiffs claim they and those similarly situated cannot hire subcontractors to perform services under their JS Express contracts.  Dkt. 55, ¶ 31.  However, Marcel Reynolds (Chicago) and Chris McKnight (St. Louis) testify that they have hired subcontractors to perform services on their contracts.  *Reynolds Cert.*, ¶ 5, 11; *McKnight Cert.*, ¶ 14.  Again, the Chicago Contractors serving the U.S. AutoForce contract were a distinct group that had different experiences and conditions on the ground than did the rest of JS Express' Contractors.

Plaintiffs claim they and those similarly situated are precluded from working for others. Dkt. 55, ¶ 38.  Even assuming that Plaintiffs' claims are accurate, Contractors in Kansas City and St. Louis were subject to different rules.  *Supra*, § II.  For example, Contractor Harry Hicks (Kansas City) owns and operates a promotional business called Show-Me Promotions; Contractor Daniel Dieters owns and operates DEI Home Inspections, LLC;   Contractor Chris McKnight currently works in a restaurant and formerly had a contract with both JS Express and Access Courier – a direct JS Express competitor;   and Contractor Richard Frisch previously managed a Steak N' Shake Restaurant but recently started contracting full-time to make more money; *Hicks Cert.*, ¶ 16; *Dieters Cert.*, ¶ 7.; *McKnight Cert.*, ¶, 15; and *Frisch Cert.*, ¶ 8.

Plaintiffs also claim Contractors had no control over the key determinants of profit and loss. Dkt. 55, ¶ 37. However, other Contractors confirm they negotiate rates for services with JS Express, pick and choose routes based on profitability and time commitment and are free to accept or reject work at will, with no advance warning, for any reason or no reason at all and without repercussion. *Haukap Cert.*, ¶ 7; *Reeder Cert.*, ¶¶ 4, 7; *Reynolds Cert.*, ¶ 3; *Cochran Cert.*, ¶ 10; *Fleming Cert.*, ¶ 14, *Rinaberger Cert.*, ¶ 7, 9, 12, 17; *Bauer Cert.*, ¶ 12, *Reeder Cert.*, ¶ 4; *Gray Cert.*, ¶ 10, 13.

Similarly, Jasper Simpson and others turn down work where long drives make fuel costs uneconomical. *Simpson Cert.*, ¶ 3; *Gray Cert.*, ¶ 8. Others turn down work where – in their estimation – the route simply does not pay enough. *McKnight Cert.*, ¶ 10 ; *Fleming Cert.*, ¶ 7. Still others optimize their profits by selecting a particular type of vehicle. For instance, Kenneth Maurice Gray replaced his car with a van because he can carry more and earns higher rates per delivery for the larger items he carries. *Gray Cert.*, ¶ 5. Contractor Richard Bauer "switched from a car to a truck over the past year because of fuel savings." *Bauer Cert.*, ¶ 9. Similarly, some Contractors operate multiple vehicles so they can maximize profits, delivering payroll one day and large equipment the next. *Reynolds Cert.*, ¶ 7. Contractors also testify that they chose their vehicle because of the types of deliveries it permits them to make. *Fleming Cert.*, ¶ 6 (drives a minivan because "I can make more money delivering with a van.")

Moreover, contrary to the claims in the inadmissible DOL report that "Contractors believe they are permanent employees," "that they are under "windows of hours" in which they must "report" for work, that they "have to report their daily availability to JS Express," and are "required to wear a JS Express uniform", Contractors doing business with other JS Express locations and customers testify otherwise. *Supra*, § II.

For these reasons, Plaintiffs roles in Chicage that were dependent on the U.S. AutoForce contract were unique and significantly different from the Contractors working out of JS Express' other locations.  They are not similarly situated and, if the Court grants Plaintiffs' Motion for Certification, conditional certification should be strictly limited to the Contractors who delivered for U.S. AutoForce in Chicago.

**D.   Plaintiffs' Proposed Notice Does Not Fully and Fairly Inform Putative Plaintiffs of the Action And a Single Notice Is Sufficient**

JS Express does not believe that conditional certification is appropriate in this case and, as set forth above, opposes Plaintiffs' motion to that end.  Nonetheless, in the event that the Court does grant Plaintiffs' motion and conditionally certifies a class, JS Express does not oppose the issuance of a Court-authorized notice.  JS Express does, however, have significant concerns about the form of notice and related response period that Plaintiffs have proposed.

The district court has the authority to manage the cases before it, including the opt-in process in FLSA actions.  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989).  But, in exercising that authority it is paramount that the Court avoid giving putative plaintiffs (non-lawyers who are currently unrepresented) any indication that could be interpreted to mean that the Court endorses the merits of Plaintiffs' action:

> In exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality.  To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action.

*Hoffmann-La Roche*, 493 U.S. at 174; *see also Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982) (trial courts must avoid the appearance of "judicial sponsorship of the notice.").

For this reason, it is inappropriate for Plaintiffs' notice to begin with a formal pleading header or case caption, suggesting to an unrepresented party that the notice may be an official

court-issued document. *Knispel v. Chrysler Group LLC*, 11-11886, 2012 WL 553722 (E.D. Mich. Feb. 21, 2012) ("The case caption shall not appear on the notice."); *Martinez v. Cargill Meat Solutions*, 265 F.R.D. 490, 499 (D. Neb. 2009) ("placing the court name in the heading is improper because it may be misconstrued as judicial support for the plaintiffs' litigation"); *DeKeyser v. Thyssenkrupp Waupaca, Inc.,* 08-C-488, 2008 WL 5263750 (E.D. Wis. Dec. 18, 2008) (striking heading with the name of the Court because it "could have the effect of creating the appearance of judicial sponsorship of the notice"). Instead, the notice should be in the format of a letter from Plaintiffs' counsel to the potential class members. *See, e.g., Howard v. Securitas Sec. Services, USA Inc*., 08 C 2746, 2009 WL 140126 (N.D. Ill. Jan. 20, 2009) ("Plaintiffs' counsel should consider placing the notice on its letterhead to ensure that no putative class member is misled as to the origin of the document.").

In addition, the Plaintiffs should also be required to include a disclaimer at the top of the notice stating that the Court has expressed no opinion on the merits of the case; burying that language at the "bottom of page 2" is unacceptable. *Martinez*, 265 F.R.D. at 499. The District of Nebraska in *Martinez* required plaintiffs to remove the caption from the notice and, instead, include the following heading and disclaimer at the tope of the document:

**NOTICE OF COLLECTIVE ACTION LAWSUIT**

**MARTINEZ, ET AL. v. CARGILL MEAT SOLUTIONS CORP.**

> This notice is for the sole purpose of determining the identity of those persons who wish to be involved in this case. Although the United Stated District Court for the District of Nebraska has authorized sending this notice, the court has not considered or made any decision as to the merits of plaintiffs' claims or defendant's defenses.

*Id.*; *see also Knispel*, 2012 WL 553722 ("the Court concludes that the statement indicating that the Court has not taken a position as to the litigation should appear on the first

page of the notice.")  The Court should order the Plaintiffs to remove the case caption from the notice and adopt a similar heading and disclaimer as used in *Martinez*.

Plaintiffs' notice must also be "accurate."   *Hoffmann-La Roche*, 493 U.S. at 170. Plaintiffs' proposed notice contains the following statement, centered and in bold:  "This is <u>not</u> a solicitation from a lawyer."  (Dkt. 53-1 at page 3 of 8)(emphasis in original).   The notice is plainly a solicitation to join the suit.  And, it is from Plaintiffs' counsel, who will represent anyone who opts in.  (Dkt. 53-1 at page 6 of 8, "Do I have a lawyer in this case?").  Plaintiffs' proposed language is inaccurate and must be stricken from the notice.

Finally, JS Express objects to Plaintiffs' request to send a "reminder" notice and for a 60-day opt in period.  Courts across the country have held the "reminder" notices are unnecessary, could be interpreted as judicial encouragement to join the lawsuit, and simply stir up litigation. *See, e.g., Schroeder v. Humana Inc.*, No. 1:12-cv-0137, 2012 WL 5931886, *9 (E.D. Wis. November 27, 2012); *Knispel v. Chrysler Group LLC,* 11-11886, 2012 WL 553722 (E.D. Mich. Feb. 21, 2012); *Calderon v. Geico Gen. Ins. Co.*, RWT 10CV1958, 2011 WL 98197 (D. Md. Jan. 12, 2011); *Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 754 (N.D. Ill. 2010); *Witteman v. Wisconsin Bell, Inc.*, 09-CV-440-VIS, 2010 WL 446033 (W.D. Wis. Feb. 2, 2010). A single notice is common practice throughout the country, and Plaintiffs have made no showing that it would be insufficient here.  The Court should deny Plaintiffs' request to send a 30-day reminder notice.

Plaintiffs have also requested a 60-day period for opt-in plaintiffs to return their consent forms.  Plaintiffs, however, have not put forward any suggestion that the potential plaintiffs are a transient group, will be extraordinarily difficult to locate, or have difficulty receiving and responding to mail such that a long response period is required.  As numerous courts have held,

45 days is a sufficient amount of time for putative plaintiffs to receive, consider, and respond to the notice. *Greenwald v. Phillips Home Furnishings, Inc.*, 2009 WL 1025545 (E.D. Mo. April 15, 2009); *Knipsel*, 2012 WL 553722 at *8; *Martinez*, 265 F.R.D. at 501; *DeKeyser*, 2008 WL 5263750, at *6. Moreover, given the concerns about delay and statute of limitations issues raised in Plaintiffs' brief, Plaintiffs should not object to avoiding further delay through the opt-in process. *See, e.g., Knipsel*, 2012 WL 553722 at *8. Accordingly, the Court should order Plaintiffs to include a 45-day return period in the notice.

### E.    Plaintiffs' Request For Equitable Tolling Should Be Denied

As the party seeking relief, Plaintiffs bear the burden of demonstrating that they are entitled to equitable tolling. *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 675 (8th Cir. 2009). Plaintiffs must establish two elements: (1) that they have been pursuing their rights diligently, and (2) that some extraordinary circumstance stood in their way and prevented them from seeking conditional certification and sending notices to putative plaintiffs at an earlier date. *See, id.*

"Had Congress wished to have opt-in plaintiffs' lawsuits relate back to the filing date of the lead plaintiff, Congress would have spelled out such a rule instead of spelling out its opposite." *Sims v. Hous. Auth. of City of El Paso*, EP-10-CV-109-KC, 2010 WL 3221790 (W.D. Tex. Aug. 13, 2010) (*citing* 29 U.S.C. § 256). Because it runs contrary to the intent of Congress, and "[b]ecause statutes of limitations protect important interests of certainty, accuracy, and repose, equitable tolling is an exception to the rule, and should therefore be used only in exceptional circumstances." *Firstcom*, 555 F.3d at 675 (quoting *Motley v. U.S.*, 295 F.3d 820, 824 (8th Cir. 2002)). "Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Wallace v. Kato*, 549 U.S. 384, 396

(2007).  *See also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (equitable tolling to be used "sparingly"); *Pecoraro v. Diocese of Rapid City*, 435 F.3d 870, 875 (8th Cir. 2006) ("Courts generally require strict compliance with a statute of limitations and rarely invoke doctrines such as equitable tolling").  Further, in the Eighth Circuit, equitable tolling is an "exceedingly narrow window of relief" that may be appropriate when "conduct of the defendant has lulled the plaintiff into inaction." *Jihad v. Hvass*, 267 F.3d 803, 805 (8th Cir. 2001).

Plaintiffs cannot meet their burden to show that equitable tolling is appropriate here. Moreover, because the application of equitable tolling depends on *an individual's* specific circumstances, it should not be applied classwide and is yet another reason that this case is unsuited for class treatment.

      i.      *Plaintiffs Have Not Met Their Burden To Demonstrate That They Are Entitled To Equitable Tolling.*

Plaintiffs have not submitted any affidavits or other evidence to establish that they have been pursuing this case diligently or what extraordinary circumstance, they allege, have prevented them from seeking conditional certification at an earlier date.  Instead, Plaintiffs rely solely on the docket history of this matter, claiming that the procedural history of this action amounts to the requisite "extraordinary circumstances."  Plaintiffs' attempt to paint the normal procedural aspects of this matter as "extraordinary" is unpersuasive.  Moreover, to the extent there have been certain delays in this action, they have been caused by factors under Plaintiffs' unique control.

First, Plaintiffs imply that JS Express delayed this action by requiring personal service of the summons and complaint.  Federal Rule 4(d)(2), however, provides that a party may refuse to waive the personal service requirement.  What's more, Plaintiffs fail to explain why *they failed*

*to serve JS Express for two-months*, from March 14 to May 17, 2012.   A two-month delay in serving the defendant does not support a finding that Plaintiffs have been pursuing their rights diligently.  Plaintiffs could have easily avoided this delay.

Plaintiffs also complain that the action was delayed due to a transfer from the Northern District of Illinois.   Again, this delay was not an extraordinary circumstance outside of the Plaintiffs' control.  The fact is, *Plaintiffs filed their case in the wrong district*.  The Independent Contractor Agreement clearly states:

> Any claim or cause of action arising or relating to this Agreement shall be brought in the Circuit Court of St. Louis County, Missouri, or, if appropriate, in the Federal District Court for the Eastern District of Missouri, Eastern Division, and the Parties hereby agree to submit to such jurisdiction.

(Dkt. 55 at p. 34 of 38).   Any delay related to the transfer of venue was entirely avoidable by Plaintiffs.  It is not the kind of exceptional circumstances beyond Plaintiffs' control required for equitable tolling.

In addition, Plaintiffs fail to mention the *more than three-month delay* between the transfer of the case to this district (Dkt. 28) and their motion for conditional class certification and notice (Dkt. 53).  Again, this delay was entirely under Plaintiffs' control and was not an extraordinary circumstance.

Finally, Plaintiffs cite JS Express's refusal to contact information for putative class members as a reason to toll the statute of limitations.   Of course, JS Express has no obligation under the FLSA to produce a list of putative class members until the class has been conditionally certified. *Putnam v. Galaxy 1 Mktg., Inc.*, 276 F.R.D. 264, 276 (S.D. Iowa 2011).   Even then, as explained in greater detail below, it is not the formal notice issued by Plaintiffs' counsel that

determines whether equitable tolling is appropriate; what matters is whether each plaintiff was sufficiently aware of their legal rights.

The Southern District of Iowa recently addressed an eerily similar set of facts. *Putnam v. Galaxy 1 Mktg., Inc.* 276 F.R.D. 264 (S.D. Iowa 2011). In *Putnam*, a group of satellite television installation technicians filed suit in the Northern District of Illinois alleging that they were improperly treated as independent contractors in violation of the FLSA's overtime and minimum wage requirements. *Id.* at 267-68. The case was transferred to the Southern District of Iowa, where Plaintiffs' moved for conditional class certification 13 months after the original complaint had been filed. *Id.* at 267.

Plaintiffs sought equitable tolling based on the defendant's refusal to disclose contact information for putative plaintiffs. *Id.* at 276. The court held that "there is no requirement in § 216(b) to provide contact information and this is not sufficient grounds to permit equitable tolling." *Id.* at 276. The court further, and correctly, noted that:

> To grant the exceptional remedy of equitable tolling any time an FLSA defendant declines to provide contact information or to toll claims would, in effect, require that the statute of limitations for FLSA claims be tolled as a matter of course for all potential plaintiffs whenever the first plaintiff files her complaint—a result plainly contrary to the procedural rules that govern FLSA collective actions.

*Id.* (*quoting Amendola v. Bristol–Myers Squibb Co.*, 558 F.Supp.2d 459, 480 (SDNY 2008)).

Plaintiffs have submitted ***no evidence*** towards their burden to show that equitable tolling is appropriate in this matter. The self-inflicted procedural delays and imagined discovery issues do not constitute extraordinary circumstances meriting the rare remedy of equitable tolling and their request should be denied.

ii.   *Equitable Tolling Is An Individual Issue That Should Not Be Applied To A Group Of Unknown Potential Plaintiffs.*

The determination of whether equitable tolling is an appropriate remedy turns on each particular plaintiff's knowledge about the existence of their claim.  *See, e.g., Goodman v. Port Authority*, 850 F. Supp. 2d 363, 382 (S.D.N.Y. 2012) ("whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action…"); *Knipsel v. Chrysler Group LLC*, No. 11-11886, 2012 WL 553722, *6 (E.D. Mich. Feb. 21, 2012) (weighing "petitioner's lack of constructive knowledge" as part of 5-factor test); *Excobedo v. Dynasty Insulation, Inc.*, 694 F.Supp.2d 638, 653 (W.D. Tex. 2010) ("equitable tolling focuses on the employee's ignorance").  For that reason, equitable tolling is "not suitable for preemptive, one-size -all application to a group of-yet unidentified potential plaintiffs." *Id.*; *see also Syrja v. Westat, Inc.* 756 F.Supp.2d 682, 689 n. 9 (D. Md. 2010) ("As a rule, unknown prospective plaintiffs in a proposed class action are not entitled to equitable tolling absent a showing of extraordinary or unusual circumstances.").

For the same reason, Plaintiffs' potential reliance on equitable tolling makes this case unsuitable for class treatment.  The putative class would be not similarly situated because the equitable tolling analysis would require the Court to consider each plaintiff's circumstances individually and hold "an indeterminate number" of separate hearings on the issue.  *Lyons v. Potter*, 521 F.3d 981, 983 (8th Cir. 2008); *Syrja*, 756 F.Supp.2d at 689 n. 9.

## IV.   CONCLUSION

For the reasons stated above, Defendant J S Express Incorporated respectfully requests that this Court deny Plaintiffs' Motion to Authorize Notice to Similarly Situated Persons Pursuant to 29 U.S.C. §216(b), and for other and such further relief as this Court deems just and proper.

Respectfully submitted this 15th day of February, 2013.

**CONSTANGY, BROOKS & SMITH, LLP**

By: /s/Falon M. Wrigley_____.
        J. Tobias Dykes, *Admitted Pro Hac Vice*
        One Federal Place, Suite 900
        819 Fifth Avenue North
        Birmingham, Alabama 35203
        (T): (205) 252-9321
        (F): (205) 323-7674
        tdykes@constangy.com

        Falon M. Wrigley, #61313
        7733 Forsyth Blvd., Suite 1325
        St. Louis, Missouri  63105
        T: (314) 925-7273
        F:  (314) 925-7283
        fwrigley@constangy.com

        **Attorneys for Defendant**
        **J S Express Incorporated**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing document was served via operation of the Court's electronic filing system this 15th day of February, 2013 to:

Douglas M. Werman, Esq.
Werman Law Office, P.C.
77 West Washington Street, Suite 1402
Chicago, Illinois 60602
dwerman@flsalaw.com

David Erik Stevens, Esq.
Werman Law Office, P.C.
77 West Washington Street, Suite 1402
Chicago, Illinois 60602
dstevens@flsalaw.com

Maureen A. Salas, Esq.
Werman Law Office, P.C.
77 West Washington Street, Suite 1402
Chicago, Illinois 60602
msalas@flsalaw.com

Attorneys for Plaintiffs

                                        s/Falon M. Wrigley_____
                                        Attorney for Defendant